**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

RICKY ARTHUR OSBORN,

                            Plaintiff,

     v.                                   No. 13-CV-372
                                        (GTS/CFH)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

_____

**APPEARANCES:**                     **OF COUNSEL:**

PETER M. MARGOLIUS, ESQ.
Attorney for Plaintiff
7 Howard Street
Catskill, New York 12414

HON. RICHARD S. HARTUNIAN       VERNON NORWOOD, ESQ.
United States Attorney for the            Special Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff Ricky Arthur Osborn ("Osborn") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act.

Osborn moves for a finding of disability and the Commissioner cross-moves for a

judgment on the pleadings.  Dkt. Nos. 10, 13.  For the reasons which follow, it is

_____

     [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

recommended that the Commissioner's decision be affirmed.

## I. Background

### A. Facts

Born on November 29, 1964, Osborn was forty-six years old when he applied for disability benefits. T. 228.[2] Osborn graduated from high school and served for four years in the miliary. T. 42-43. Osborn's previous work experience includes work as a mold technician, maintenance man, and steel worker. T. 55-68, 275-78. Osborn alleges disability from multiple musculoskeletal impairments affecting his neck, back, leg, and knees. T. 283.

### B. Procedural History

On March 18, 2010, Osborn filed an application for disability insurance benefits and social security income ("SSI") pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of October 1, 2008. T. 228-34; but see T. 20 (contending that the alleged onset date was actually May 26, 2008). That application was denied on June 10, 2010. T. 141-46. Osborn requested a hearing before an administrative law judge ("ALJ"), Dale Black-Pennington, which was held on April 26, 2011. T. 149-76, 90-11 (transcript of the hearing). In a decision dated June 7, 2011, the ALJ held that Osborn was not entitled to disability benefits. T. 121-135. Osborn's counsel filed a timely request for review with the Appeals Council and on October 27, 2011 the case was remanded back to the ALJ. T. 136-39, 177-80.

---

[2]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Docket No. 10.

Osborn appeared and testified at a second hearing before ALJ Black-Pennington on January 17, 2012.  T. 34-89 (transcript from the hearing).  In a decision dated February 16, 2012, the ALJ again held that Osborn was not entitled to disability benefits.  T. 17-30.  Osborn's counsel filed another timely request for review with the Appeals Council, and on February 22, 2013 that request was denied, thus making the ALJ's findings the final decision of the Commissioner.  T. 1-16.  This action followed.

## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey

<u>v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); <u>Halloran</u>, 362 F.3d at 31.


## B.  Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  <u>Id.</u> § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  <u>Id.</u> § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  <u>Id.</u> § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  <u>Ventura v. Barnhart</u>, No. 04-CV-9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir.

---

[3] While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  <u>Donato v. Sec 'y of Health and Human Servs.</u>, 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

## C. ALJ Black-Pennington's Findings

Osborn, accompanied by a non-attorney representative, and an impartial vocational expert ("VE"), testified at the hearing held on January 17, 2012.  T. 34-89 (transcript from the administrative hearing).  Using the five-step disability sequential evaluation,

the ALJ found that Osborn (1) had not engaged in substantial gainful activity during the period from the alleged onset date through the date Osborn was last insured; (2) had the following severe medically determinable impairments: degenerative disc disease of the lumbar and cervical spine and status/post left leg fracture and repair; (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [("RFC")] to perform light work . . . except he must avoid heights and heavy machinery, and can only occasionally perform overhead reaching," and thus, (5) given his age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy as outlined by the VE. Therefore, a determination of not disabled was made.

### D. Osborn's Contentions[4]

Osborn contends that the ALJ failed to properly establish his RFC, based on the fact that the ALJ erred in according adequate weight to the opinion of treating neurosurgeon Dr. McCormack and the RFC was not supported by substantial evidence.

### 1. RFC

The ALJ determined that Osborn retained the RFC "to perform light work . . . except he must avoid heights and heavy machinery and can only occasionally perform

---

[4] Defendant's correctly indicate that plaintiff did not dispute the ALJ's findings at steps one, two, and three of the sequential evaluation. Def. Memorandum of Law (Dkt. No. 13) at 11. Accordingly, these findings shall neither be recommended to be discussed nor disturbed by the undersigned.

overhead reaching." T. 24. In reaching this assessment the ALJ discussed Osborn's

testimony and the notes and opinions of Drs. DiGiovanni, McCormack, Puri, and

Gorczynski. T. 24-28. Specifically, the ALJ stated that Dr. McCormack's opinion was

"given very little weight" as Dr. McCormack was commenting on the issue of disability

which is reserved for the Commissioner. T. 27. Conversely, Dr. Puri's assessment was

given great weight per the support in the record, which included notations about

Osborn's employment, daily activities, and objective medical tests to determine strength

and range of motion. Id.


### i. Treating Physician's Rule

   Osborn contends that the ALJ erred when she failed to accord more weight to the

opinion of treating neurosurgeon, Dr. McCormack. Pl. Memorandum of Law (Dkt. No.

10) at 1. When evaluating a claim seeking disability benefits, factors to be considered

include objective medical facts, clinical findings, the treating physician's diagnoses,

subjective evidence of disability, and pain related by the claimant. Harris v. R.R. Ret.

Bd., 948 F.2d 123, 126 (2d Cir. 1991). Generally, more weight is given to a treating

source. Under the regulations, a treating source's opinion is entitled to controlling

weight if well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is inconsistent with other substantial evidence in the record. 20 C.F.R.

§ 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134. "This rule applies equally to

retrospective opinions given by treating physicians." Campbell v. Astrue, 596 F. Supp.

2d 445, 452 (D. Conn. 2009) (citations omitted). Before a treating physician's opinion

can be discounted, the ALJ must provide "good reasons." Schaal v. Apfel, 134 F.3d

496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." <u>Schaal</u>, 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. <u>Snell v. Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. <u>Id.</u> at 133-34; <u>see</u> 20 C.F.R. § 404.1527(e) (2005).

Dr. McCormick began treating Osborn after he sustained a fractured vertebrae during a motor vehicle accident. T. 342, 352 (imaging results showing a fractured lumbar vertebra). Dr. McCormick noted in his first visit that Osborn was "doing quite well with his current back brace," and that the "fracture [wa]s healing as best as can be expected." T. 347. A follow-up appointment indicated that Osborn was "doing quite well," recent x-rays "show[ed] decent alignment and continued healing of the . . . fracture," and that, if things continued as they were, in another month Dr. McCormack "would consider discontinuing [the] brace . . . ." T. 346. By February 4, 2003, three months after the fracture, another physician from Dr. McCormack's group indicated that Osborn's "fracture has healed quite well . . . [Osborn] ha[d] no back pain and no neurologic symptoms . . . [and] plan[ned] to return to work . . . ." and that the group was pleased with Osborn's progress. T. 345.

8

However, in 2009, Osborn returned to the Bone and Joint Center and a prior treating physician, Dr. DiGiovanni, to report an increase in upper back and left shoulder pain, without any new injuries.  T. 327.  Osborn reported that he was a self-employed landscaper.[5]  Id.  Upon examination it was noted that Osborn appeared healthy, well developed, alert, and oriented.  T. 328.  While there was tenderness around his spine, Osborn's posture, gait, muscle tone, reflex strength, motor strength, and range of motion were all generally normal.  Id.  Moreover, x-rays of the left shoulder were normal and x-rays of the thoracic spine only indicated some degenerative changes.  T. 329.

Osborn returned to Dr. Giovanni a month later suffering from left calf pain.  T. 330.  Osborn's records continue to indicate that he was a self-employed landscaper and that he sustained his injury while playing volleyball.  Id.  All physical examination of his head, spine, hips, knees, and feet were normal.  T. 331.  At the end of October, Osborn underwent a MRI of his cervical spine which showed degenerative changes "with narrowing of the spinal canal and severe flattening of the cord."  T. 333.

Osborn returned to Dr. McCormick in January of 2010 after his MRI and worsening complaints of neck, shoulder and arm pain and dysfunction.  T. 335-40.  Dr. McCormick recommended various surgical interventions, to which Osborn was receptive.  T. 339.  Dr. McCormack also addressed Osborn's concerns regarding his functional capacity noting that "it would [not] be prudent or reasonable to think that [Osborn] is going to return to the construction trade after having such a procedure."  Id.

---

[5] During his testimony Osborn explained that he was only working part-time as a landscaper for his brother-in-law.  T. 43-44.  In that capacity Osborn was tasked with putting up storm windows, cleaning gutters, and other things of that nature.  T. 44-45.  The work was inconsistent, ranging from a few hours up to three days a week.  T. 46.

Osborn underwent surgery on his neck in February 2010.  T. 356-57.  On March 4, 2010 he was seen for his first post-operative visit with Dr. McCormick.  T. 341.  Osborn "state[d] that he fe[lt] much better overall," and his incision looked to be healing well.  <u>Id.</u> Dr. McCormick noted continued improvement in April of 2010, as well as a radiology report which indicated "appropriate placement of screws and hardware," post-operatively.  T. 431.  On May 10, 2010, during a follow-up visit Osborn was again complaining of neck and arm pain, though it was noted that he sustained a trauma by accidentally running into something the day before.  T. 429.  Physical examination showed "good muscle mass and strength," resulting in Dr. McCormick prescribing physical therapy.  T. 429.

Also in May of 2010, Osborn underwent an internal medical exam with consultative physician Dr. Puri.  T. 402-405.  Dr. Puri noted that Osborn could independently complete his activities of daily living by showering, bathing, and dressing.  T. 403. Osborn also reported that he passed his day by watching television, reading, and going out.  <u>Id.</u>  Dr. Puri noted that Osborn was in no acute distress, with a normal gait and stance.  <u>Id.</u>  He could fully squat and walk on his heels and toes without difficulty.  <u>Id.</u> He also required no assistance changing or getting on and off the examination table. <u>Id.</u>  Osborn's cervical spine showed some decreased range of motion and mild tenderness, but the rest of his spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles showed full range of motion and no evidence of instability, swelling, or tenderness.  T. 404.  Osborn's prognosis was classified as "fair" and Dr. Puri stated that he

did not have any objective limitations to communication, fine

> motor, or gross motor activity.  There were no objective
> limitations to [his] . . . gait.  Mild limitations to his activities of
> daily living . . .and . . . to overhead reaching.  It is
> recommended that [Osborn] not lift heavy weights, work
> from heights or with heavy machinery, or be allowed to drive
> . . . .

T. 404-405.  Additionally, radiology reports of the cervical spine indicated "mild

degenerative spondylosis" and degenerative changes and an old fracture of the

lumbosacral spine.  T. 406-407.

On June 23, 2010, Osborn returned to Dr. McCormack, reporting some continued

difficulty with his neck, but showing a well healed incision "without motor or sensory

issues."  T. 426.  Due to extenuating circumstances, Osborn did not participate in the

recommended physical therapy.  Id.  However, Dr. McCormack provided him with a new

prescription for such indicating that it would "go a long way to loosen[] up his neck."  Id.

Osborn next returned three months later on September 27, 2010.  T. 421.  The

complaints of neck, shoulder, and arm pain on his left had much improved, though now

Osborn complained of similar pain on his right side.  T. 421.  Physical examination

showed equivalent sensation on both sides, no visible "fatness" of his hand, good motor

function, brisk reflexes, and full range of motion in his cervical spine.  Id.  Further

radiology studies were recommended.  Id.  A MRI completed on that day illustrated the

surgical intervention and also showed no cord compression or recurrent disc herniation.

T. 423.

At a follow-up office visit with Dr. McCormick on November 8, 2010, Osborn

reported that "his arms generally feel well, but [there remains a] . . . nagging discomfort

in the back of his neck."  T. 419.  The pain had shifted back into the left arm.  Id.

However, Dr. McCormick noted that the MRI showed a successful decompression of Osborn's spine with "no evidence of a new disc herniation or [cord] . . . narrowing," and a "good incorporation of the rods and screws, as well as the bony fusion . . . ." Id. Ultimately, Dr. McCormick suggested no further surgical intervention. Id. Due to extenuating circumstances, Osborn had also not followed the medication regimen prescribed, so Dr. McCormick was attempting to remedy that. Id. Dr. McCormick concluded by saying "[a]t this point I believe [Osborn] is completely disabled. He has difficulty turning his head and neck [and] . . . has not really been able to get or do his regular exercise regimen." Id.

A month after that office visit, Osborn was admitted to the hospital after "he slipped and . . . fell about [twelve] feet," while working on the roof of a one-story building. T. 460. It was determined that Osborn fractured his left tibia and fibula and required surgery, which was performed by Dr. Gorczynski. T. 458-60. Osborn was seen ten days post-operatively and Dr. Gorczynski noted that his wounds were well-healed, with no evidence of infection. T. 456. Moreover, Osborn had "near full knee range of motion and mildly restricted ankle range of motion." Id. Osborn was given strict instructions to remain non-weight bearing and use his crutches. T. 457.

Osborn was seen by Dr. Gorczynski again on January 19, 2011. T. 454-55. X-rays showed that the hardware in his leg was in the proper position. T. 454. Osborn related that he had already began weight bearing without much difficulty although he had not received medical clearance to do so. Id. Dr. Gorczynski recommended that Osborn proceed with partial weight bearing and begin physical therapy for his knee and ankle at the next visit. Id. Less than a week later Osborn was seen by Dr. McCormack, who

commented that Osborn's "neck [wa]s less of a problem to him than his leg," at that he was currently "completely disabled with his multiple fractured leg . . . . " T. 451. Dr. McCormack held his treatment in abeyance pending healing of Osborn's leg. Id.

On February 23, 2011, Osborn returned to Dr. Gorczynski who noted that "[e]xamination [of the] left knee and ankle range of motion is returned to near normal." T. 452. Further, there was minimal tenderness over the site of the hardware in his leg and no significant tenderness over the fracture site. Id. Osborn was walking with a cane and complaining of left knee pain; however, it was much less significant than that which he complained about at his previous visit. Id. Dr. Gorczynski stated that "[t]he fracture lines are beginning to disappear[,] knee alignment is anatomic[, and Osborn] . . . will continue with his own rehabilitation as he is progressing nicely in his ankle and knee range of motion are not particularly restricted at this point." Id.

On March 23, 2011, Osborn returned to Dr. McCormack, who opined that Osborn "still has significant problems and pain [with his left leg] . . . but apparently they feel he is well enough to have his cast off, and he can start to use [his leg]." T. 479. Dr. McCormack noted continued burning pain in Osborn's arm, to be treated with medication which was previously contraindicated due to swelling and the dangers that posed given Osborn's broken leg and subsequent casting. Id. The medication was commenced, though Dr. McCormack concluded that "[a]t this point because of [Osborn's] residual pain, restriction, and range of motion in his neck, and recent fracture of his leg, he is 100% disabled." Id.

Osborn did not return to Dr. McCormick again until September 14, 2011, six months later. T. 482-83. At that time Osborn reported that the medication he was prescribed

"does not seem to have any significant impact on the pain in his arms," leading Dr. McCormack to suggest either doubling the dose of medication he is currently on or weaning him off from that and trying something different.  T. 482.  Osborn chose the latter.  Id.  Osborn returned to Dr. McCormick three months later.  T. 483.  When Osborn returned home from the September appointment, he reviewed his records and decided not to take the newly prescribed medication because he had previously taken it and "it gave him very significant muscle pain so he did not want to start it."  Id.  Another medication was discussed and prescribed.  Id.  Osborn also complained about discomfort in the middle of his back.  Id.  Dr. McCormick examined Osborn and found that "he does not really have any lower extremity weakness," though he requested further radiology studies to be sure there was no further cord compression.  Id.

On January 18, 2012, Osborn returned to Dr. Gorczynski complaining of increasing right knee pain.  T. 488.  Upon examination it was noted that Osborn was healthy and well developed.  Id.  His hips and ankles were normal, showing unrestricted range of motion.  Id.  Osborn's knees showed some tenderness, crepitus, and slight swelling.  Id.  Osborn was ultimately diagnosed with bilateral knee pain and recommended to go for a MRI of his right knee to evaluate for a meniscal injury, whereupon various interventions from surgery to cortisone injections could be considered depending on the results.  T. 489.

Osborn does not disagree with the fact that Dr. McCormack's statements regarding the issue of disability were inappropriate, as that "is an issue reserved for the Commissioner . . . ."  Pl. Memorandum of Law at 5.  However, Osborn contends that the medical record supports such statements of disability and that Dr. McCormack's

opinions about greater restrictions for Osborn should be honored.

However, greater restrictions are not indicated by the medical record as a whole, or even some of Dr. McCormack's own notes. For example, despite Osborn's complaints of right-sided pain in September of 2010, Dr. McCormack noted that upon physical examination Osborn had equivalent sensation on both sides, good motor function and reflexes, and a full range of motion in his cervical spine. Moreover, the MRI taken that day showed, per Dr. McCormack's own reading, a successful surgery with no new disc herniation or cord compression, resulting in a recommendation of no further surgical intervention.

Further, despite Osborn's continued complaints to Dr. McCormack of pain in 2010, it was noted that he was hospitalized shortly thereafter for falling off a roof. Osborn testified that he was not working, but was assisting elderly neighbors. T. 52. When Osborn went up to inspect the roof for the neighbors, he contends that he "stepped on some ice and slid[] off . . . " Id. Such activities, even if fully crediting Osborn's testimony, are inconsistent with his prior complaints of pain and immobility. Also, when taken in conjunction with earlier contentions of disabling pain yet testimony and medical records indicating work as a landscaper and the ability to engage in recreational sports, such proffers are specious at best.

Moreover, Dr. Puri's assessment and the later records from Dr. Gorczynski contradict any potential restrictions of an increased severity allegedly posed by Dr. McCormack. Dr. Puri found few objective findings of pain or loss of movement during the consultative examination. So much so, Dr. Puri assessed that Osborn had (1) no limitations in his gait or fine or gross motor skills; (2) mild limitations in overhead

15

reaching; and (3) a complete prohibition on heavy lifting, working from heights or with heavy machinery, and driving.  Further, even though Osborn's leg injury and subsequent surgery left him temporarily unable to perform work, Dr. Gorczynski's notes indicated that within a few months Osborn had healed, experienced minimal tenderness, had near full range of motion in his knee and ankle, and had independently began weight bearing even though not yet medically cleared to do so.  These findings are consistent with the radiological studies which showed that the hardware was in place and that the fracture had healed well.  However, these findings are inconsistent with Dr. McCormack's contemporaneous notes that Osborn was completely disabled and experiencing severe pain and significant problems.  Such conclusions are also inconsistent with Osborn's testimony that he could continuously walk for a half an hour and stand for an hour at a time.  T. 110.  Neither of these conditions was expected to last, or did last, for a continuous period of more than twelve months.  42 U.S.C. § 423(d)(1).  Accordingly, Dr. McCormack's characterizations of disabling conditions or impairments requiring severe restrictions are not entitled to great weight as they are inconsistent with the body of medical evidence and Osborn's own actions and testimony.  Accordingly, the Commissioner's decision should be affirmed.

### ii.  Substantial Evidence

Osborn also contends that the ALJ's RFC determination was not supported by substantial evidence.  RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms.  Martone v. Apfel,

70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Pourpre v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

> Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient . . . Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

DiVetro v. Comm'r of Soc. Sec., No. 05-CV-830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Osborn also contends that the ALJ's RFC determination was not supported by substantial evidence. The ALJ determined that Osborn could perform light work with the exception that he must avoid heights and heavy machinery and can only occasionally perform overhead reaching.

> Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of

> walking . . . or when it involves sitting most of the time with
> some pushing and pulling of arm or leg controls . . . If
> someone can do light work, . . . he or she can also do
> sedentary work, unless there are additional limiting factors
> such as a loss of fine dexterity or inability to sit for long
> periods of time.

20 C.F.R. § 404.1567(b).

For all of the reasons stated above, the ALJ's decision that Osborn could successfully perform light work with minimal limitations is supported by substantial evidence. The objective medical evidence, namely the radiology results, indicated that Osborn had received two successful surgeries and that there was no further compromise to his back, other than mild degenerative changes, or leg. Contemporaneous medical notes from treating physicians confirm the same. Moreover, this RFC mirrors that of consultative examiner Dr. Puri. Relying on Dr. Puri's assessment was completely appropriate as a consultative examiner's opinion may serve as substantial evidence in support of an ALJ's decision. Monguer v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). For the reasons outline supra, Dr. Puri's opinion was supported by substantial evidence in the record and thus also served as substantial evidence given its consistency with the record as a whole.


### 2. Vocational Expert

The ALJ then conducted her Step Five analysis. The ALJ may apply the Grids or consult a vocational expert ("VE"). See Heckler v. Campbell, 461 U.S. 458, 461-62 (1983); Rosa v. Callahan,  168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003). "For a claimant whose characteristics match the criteria of a particular

grid rule, the rule directs a conclusion as to whether he is disabled." Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996). However, "where the claimant's work capacity is significantly diminished beyond that caused by his [or her] exertional impairment, the application of the grids is inappropriate," as the Grids do not take into account nonexertional impairments. Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986) (citations omitted).

In this case, the testimony of a VE was taken. Osborn contends that because the VE testified that, pursuant to a hypothetical including more severe limitations consistent with the conclusions made by Dr. McCormick, there were no jobs available for him to perform in the national economy, he should be determined disabled. T. 73-74. However, for the reasons discussed supra, Dr. McCormick's restrictions, and therefore any resulting hypotheticals which would include such restrictions, are irrelevant because Dr. McCormick's opinion was properly given little weight for its lack of support from the medical record and testimony.

However, Dr. Puri's assessment, which mirrors that which the ALJ decided to utilize for Osborn's RFC and was supported by substantial evidence for the reasons stated above, was also transformed into a hypothetical. T. 70 ("Assume the claimant . . . would be a younger person . . . has the . . . [RFC of] light work with no work from heights or with heavy machinery. And only occasional overhead reaching."). In response to that hypothetical, the VE stated that, based on his training and the Dictionary of Occupational Titles, there would be four different occupational titles which could be pursued by an individual with that RFC and those restrictions: Electrical assembler (National employment - 180,440; State employment - 12,920; Local

employment - 90); Shipping/receiving weigher (National employment - 66,480; State employment - 2,100; Local employment - N/A); Order clerk, food and beverage (National employment - 211,370; State employment - 8,610; Local employment - N/A); and Table worker (National employment - 410,750; State employment - 18,400; Local employment - 90).  T. 70-73; <u>see also</u> 20 C.F.R. § 404.1560(b)(2); <u>Rosa</u>, 168 F.3d at 78 (explaining that VE testimony constitutes evidence of "jobs [that] exist in the economy which claimant can obtain and perform.") (citations omitted).

As substantial evidence supports the RFC findings which served as the basis for the aforementioned hypothetical, the ALJ appropriately relied on the VE's testimony in concluding that Osborn could continue to work and find substantial gainful activity.  This satisfied the Commissioner's burden at Step 5; thus, the ALJ's decision on this ground should be affirmed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Osborn's motion seeking review of his disability determination (Dkt. No. 10) be **DENIED** and the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 13) be **GRANTED** and the decision finding disability be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Small v.</u>

Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED

R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and

recommendation upon the parties in accordance with this court's local rules.


Date: March 28, 2014
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge